No. 22-35449
Decided August 19, 2024
Rawlinson, Sung, and Rakoff (S.D.N.Y.), JJ.

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

FAYSAL A. JAMA, on behalf of himself and all others similarly
situated, JAMES KELLEY, and ANYSA NGETHPHARAT,

*Plaintiffs-Appellants*,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COM-
PANY and STATE FARM FIRE AND CASUALTY COMPANY,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Western District of Washington
Case No. 2:20-cv-454 | Hon. Marsha J. Pechman

_____

**PETITION FOR REHEARING EN BANC
OR PANEL REHEARING**

_____

Kristin A. Linsley
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Ctr., Ste. 2600
San Francisco, CA 94111
(415) 393-8200

Bradley J. Hamburger
Daniel R. Adler
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Appellees State Farm Mutual Automobile Insurance
Company and State Farm Fire and Casualty Company*

*(Additional counsel listed on inside cover)*

Eric L. Robertson
WHEELER TRIGG O'DONNELL LLP
370 17th St., Ste. 4500
Denver, CO 80202
(303) 244-1800

Peter W. Herzog III
WHEELER TRIGG O'DONNELL LLP
211 N. Broadway, Ste. 2825
St. Louis, MO 63102
(314) 326-4128

*Additional Counsel for Appellees State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*

# TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 35 STATEMENT ........................... 1

BACKGROUND ............................................................... 6

REASONS FOR GRANTING THE PETITION ........................... 11

I.    Rehearing Is Warranted Because the Majority's Opinion Conflicts with *Lara* ...................................... 11

II.   Rehearing Is Also Warranted Because the Majority's Opinion Creates a Circuit Split and Contravenes the Supreme Court's Decision in *TransUnion* ........................... 17

CONCLUSION ............................................................... 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bourque v. State Farm Mut. Auto. Ins. Co.*,
  89 F.4th 525 (5th Cir. 2023) ..............................................4, 18, 19

*Clippinger v. State Farm Mut. Auto. Ins. Co.*
  (6th Cir. Nos. 23-508, 24-5421)..................................................... 22

*DePhelps v. Safeco Ins. Co. of Am.*,
  65 P.3d 1234 (Wash. Ct. App. 2003)............................................. 6

*Drummond v. Progressive Specialty Ins. Co.*
  (3d Cir. Nos. 23-8035, 24-1267) .................................................. 22

*Freeman v. Progressive Dir. Ins. Co.*
  (4th Cir. Nos. 24-177, 24-1684)..................................................... 22

*Garcia v. Holder*,
  621 F.3d 906 (9th Cir. 2010)....................................................3, 16

*Lara v. First Nat'l Ins. Co. of Am.*,
  25 F.4th 1134 (9th Cir. 2022) ....................... 1, 2, 3, 4, 6, 9, 10, 11,
  ......................................................................... 12, 13, 14, 15, 16, 19

*Lewis v. GEICO*,
  98 F.4th 452 (3d Cir. 2024)........................................5, 19, 20, 21

*Sampson v. USAA*,
  83 F.4th 414 (5th Cir. 2023) ......................................4, 17, 18, 19

*Schroeder v. Progressive Paloverde Ins. Co.*
  (7th Cir. Nos. 24-8003, 24-1559)................................................. 22

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)....................................................5, 17, 20, 21

ii

*United States v. Lucas,*
   963 F.2d 243 (9th Cir. 1992) ........................................................ 17

**Constitutional Provisions**

U.S. Const. art. III ............................................................. 1, 5, 20, 21

**Regulations**

Wash. Admin. Code § 284-30-320(1) ...................................... 6, 13, 21

**Rules**

Fed. R. App. P. 35 .......................................................................... 4, 5

Fed. R. Civ. P. 23 ............................................................................ 13

**INTRODUCTION AND RULE 35 STATEMENT**

In a divided, published decision, the majority effectively overruled *Lara v. First National Insurance Co. of America*, 25 F.4th 1134 (9th Cir. 2022), and created a conflict with decisions of other circuits that have followed *Lara*. *Lara* held that when plaintiffs challenge the method an insurer uses to value totaled cars, they must prove that they received less than each car was worth—a highly individualized inquiry incompatible with class certification. *Id.* at 1138-40. This case is just like *Lara*, which is why the district court here decertified the classes after it was issued. But the majority opinion, as Judge Rawlinson explained in dissent, "directly conflicts with" *Lara* and relies on "singularly unpersuasive" distinctions to avoid its reasoning. Op. 29, 32. The majority opinion "also create[s] a circuit split" with on-point opinions from the Fifth Circuit, *id.* at 33-35; further conflicts with a Third Circuit decision; and endorses a view of Article III standing that contravenes Supreme Court precedent. Given these clear conflicts, this Court should grant rehearing.

Insurance policies nationwide entitle policyholders to the "actual cash value" of cars when they're totaled. Actual cash value

1

means fair market value, so insurers must determine the price a willing buyer and seller would have settled on shortly before the car was totaled. To do that, insurers often rely on third-party valuation services, which typically look to the advertised prices of used cars for sale on dealer lots. But *advertised* prices for dealer cars are often higher than the cars' actual fair market value, because dealers typically recondition used cars before sale and advertise higher prices that are then negotiated down with buyers. The valuation services on which insurers rely account for these issues by carefully adjusting advertised prices of dealer cars to better estimate the fair market value of policyholders' cars.

Policyholders have sued insurers across the country challenging these adjustments. *Lara* was such a case, and like this one it arose in Washington. The plaintiffs there claimed that Liberty Mutual, by adjusting down the advertised prices of comparable dealer cars (which are typically in above-average condition) so they could be appropriately compared to policyholders' cars, had violated Washington law. 25 F.4th at 1136-37. Under the plaintiffs' theory, that was *all* they had to prove—because the adjustments were supposedly

2

"illegal," the *Lara* plaintiffs argued that they had been injured and could recover the amount of the adjustments without proving what price each car would have fetched on the market. *Id.* at 1139-40. *Lara* rejected that theory, holding that even where an insurer applies an "illegal" adjustment, plaintiffs still must prove that they received "less than the actual value" of their cars. *Id.* And this Court held that where plaintiffs do not offer evidence capable of resolving that issue in one stroke, class certification is inappropriate. *Id.* at 1140.

But in the majority's view, *Lara* does not apply unless the challenged adjustment concerns the *condition* of cars. Because Plaintiffs here challenge adjustments to the value of dealer cars to account for the *negotiation* that occurs on most dealer lots, the majority reasons, *Lara* has no application. That exceedingly narrow view of *Lara* is untenable. When a panel resolves an issue, it is the "'reasoning central to [its] decision'" that "'bind[s] later panels.'" *Garcia v. Holder*, 621 F.3d 906, 911 (9th Cir. 2010). And *Lara*'s reasoning is irreconcilable with the majority's decision, as Judge Rawlinson's dissent explains.

3

According to the majority, because Plaintiffs contend that negotiation adjustments are "illegal," they need not prove the fair market value of each class member's car. But that's *exactly* the theory *Lara* rejected, holding that labeling "adjustments 'illegal'" does not eliminate the need for individualized inquiries into "whether each plaintiff was injured." 25 F.4th at 1140. The majority's reasoning is irreconcilable with *Lara*, and the Court should grant review to resolve that conflict. Fed. R. App. P. 35(a)(1), (b)(1)(A).

The majority's decision also conflicts with published decisions of the Fifth Circuit, which has followed *Lara* and held—including in a case against State Farm involving the same valuation method at issue here—that plaintiffs challenging the legality of valuation methods still must prove that they received less than what their cars were worth. *Sampson v. USAA*, 83 F.4th 414, 421-23 (5th Cir. 2023); *Bourque v. State Farm Mut. Auto. Ins. Co.*, 89 F.4th 525, 528-29 (5th Cir. 2023); *see* Op. at 33-35 (Rawlinson, J., dissenting). By creating an inter- as well as an intra-Circuit split, the majority's decision undermines the orderly development of the law and warrants review. Fed. R. App. P. 35(a)(2), (b)(1)(B).

4

The conflicts do not end there. Even if Plaintiffs' illegal-deduction theory of injury were viable as a matter of Washington law, it still would run afoul of Article III, which requires anyone seeking damages in federal court to have suffered an "injury in fact" and not just an abstract "injury in law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427, 431 (2021). The Third Circuit recognized as much in another total-loss case, dismissing a challenge to GEICO's condition adjustment and holding, based on *TransUnion* and *Lara*, that "treat[ing] the condition adjustment alone as a harm . . . would impermissibly divorce [plaintiffs'] standing to sue from any real-world financial injury." *Lewis v. GEICO*, 98 F.4th 452, 460 (3d Cir. 2024).

Until now, no appellate court has approved certification of classes like those here. And when district courts have certified classes based on an illegal-deduction theory like the one Plaintiffs have advanced, other circuits have granted interlocutory review, confirming the exceptional and nationwide importance of the questions presented here. Fed. R. App. P. 35(a)(2), (b)(1)(B). The Court should grant rehearing, restore *Lara* to its rightful position, and realign its precedent with decisions of the Supreme Court and other circuits.

5

## BACKGROUND

**1.** When a car insured under one of its policies is totaled, State Farm owes the policyholder the "actual cash value" of the car right before it was totaled. 3-ER-378; 4-ER-802. Under Washington law, "[a]ctual cash value" means "fair market value," Wash. Admin. Code § 284-30-320(1), or the price "an informed buyer would willingly pay and an informed seller would accept," *DePhelps v. Safeco Ins. Co. of Am.*, 65 P.3d 1234, 1240 (Wash. Ct. App. 2003).

Estimating fair market value can be challenging—after all, "[l]ooking at the car after [an] accident doesn't always indicate its worth before." *Lara*, 25 F.4th at 1136. So insurers turn to third-party valuation services, which typically use the most readily available source of data about how much cars are worth—dealers' advertised prices on comparable used cars—and then "adjust[]" the data "to better estimate the value of the totaled car." *Id.* at 1136-37.

State Farm has used software called Autosource for that purpose. To estimate a totaled car's fair market value, Autosource draws from a database of roughly 73 million cars, looking for examples of the same year, make, model, and fuel type in the local market.

4-ER-771; SER-186-87. The advertised prices of comparable used cars are a helpful starting point, but to ensure that they accurately estimate a totaled car's fair market value, Autosource adjusts those prices in two relevant ways.

First, most of the figures in Autosource's database are prices at which dealers initially advertised used cars—but as every savvy car buyer knows, most cars sell for less than that because the dealer and buyer haggle down the price. 4-ER-805; SER-187-88. Where appropriate, therefore, Autosource adjusts the advertised prices so they better estimate the price the policyholder's car would have received from a willing buyer. 4-ER-772, SER-190-92. Autosource conducts a rigorous analysis twice a year to ensure that the adjustment it applies for negotiation is statistically sound. SER-190-92. And Autosource does not apply the adjustment with respect to prices from "no-haggle" dealerships that don't engage in negotiation. 4-ER-805.

Second, another major determinant of a car's fair market value is its condition. Autosource compares the condition of the totaled car to the typical condition of cars in the same state, age, and category; if the totaled vehicle is in above-average condition, its valuation goes

7

up, and if the condition is below average, the value goes down.  SER-189-90.

**2.**  Plaintiffs' cars were totaled, so they filed claims with State Farm.  Kelley and Jama were paid based on the value estimated in the Autosource reports.  3-ER-354-55, -362-66.  Ngethpharat objected to that estimated value, so State Farm instead paid her based on quotes from local dealers.  4-ER-868-74.

Plaintiffs then sued State Farm, claiming that Autosource's adjustments for typical negotiation and condition were unlawful under the Washington Administrative Code, which establishes procedures for settling total-loss claims.  5-ER-1120-41; 8-ER-1752-68.  Plaintiffs' theory is that because the negotiation and condition adjustments were "illegal," they were necessarily injured by, and entitled to recover in the exact monetary amount of, the adjustments.  5-ER-1134-35; 8-ER-1763-64.  Plaintiffs thus contended that they didn't "need to prove" the fair market value of individual vehicles.  SER-177; *accord* SER-164; 2-ER-35-37, -65-68.

**3.**  The district court initially certified classes of State Farm policyholders who received payments for totaled cars based on

8

valuations that included either a negotiation or condition adjustment. 5-ER-1171. The court reasoned that Plaintiffs and class members were entitled to "challenge only the legality of [the] deduction[s]" and didn't need to prove they in fact received less than their vehicles' actual cash value. 4-ER-675; 5-ER-1158-59.

Then came this Court's decision in *Lara*, 25 F.4th 1134. That case involved a similar challenge to an insurer's valuation method—there, Liberty Mutual's adjustment to the value of comparable cars on dealer lots to account for their above-average condition. *Id.* at 1136-37. The plaintiffs in *Lara* sought class certification on the theory they had to prove only that the challenged condition adjustment "violates the Washington state regulations" on total-loss claims. *Id.* at 1138. This Court rejected that theory and affirmed the denial of class certification. *Id.* at 1138-40.

As *Lara* explained, because each policyholder is entitled to fair market value, determining whether any policyholder was injured as a result of the challenged adjustment "would involve looking into the actual pre-accident value of the car and then comparing that with what each person was offered"—an "involved inquiry for each

person" that meant "common questions [would] not predominate."
25 F.4th at 1139. This Court disagreed that the plaintiffs could avoid
the requisite individualized proof by labeling the adjustments as "il-
legal" and then seeking to recover the exact amount of those adjust-
ments. *Id.* at 1139-40.

After *Lara*, the district court here decertified the classes and
granted summary judgment for State Farm. As the court explained,
the challenged adjustments here and in *Lara* were claimed to be "'il-
legal' and impermissible," yet *Lara* made clear that regulatory vio-
lations alone cannot supply "evidence of injury" for named plaintiffs
or on a classwide basis. 1-ER-11. Because Plaintiffs, like the *Lara*
plaintiffs, provided no viable classwide means to establish what each
class member's car was worth, the classes had to be decertified.
1-ER-13.

**4.** In a published, divided opinion, the panel reversed in part.
The majority recognized that *Lara* required decertification of the
class relating to Autosource's condition adjustment. But it concluded
that, despite *Lara*, the claims challenging the negotiation adjust-
ment were appropriate for class treatment. In the majority's view,

the negotiation adjustment is "flatly prohibit[ed]" under Washington law and thus permits Plaintiffs to recover the exact "amount of the negotiation adjustment," without any need to prove each car's fair market value. Op. 16-19.

Judge Rawlinson dissented, observing that the majority's reasoning on the negotiation-adjustment class is "specifically foreclosed by the analysis in *Lara*." *Id.* at 32-33. And in departing from *Lara*, Judge Rawlinson continued, the majority also created a circuit split with two Fifth Circuit decisions in similar cases that had embraced *Lara*. *Id.* at 33-35.

## REASONS FOR GRANTING THE PETITION

### I. Rehearing Is Warranted Because the Majority's Opinion Conflicts with *Lara*.

As Judge Rawlinson explains, the majority's published decision "directly conflicts with" *Lara*, 25 F.4th 1134. Op. 28. *Lara* arose in the same context, presented "virtually identical" facts, involved the same theories of liability and certification, and addressed the same arguments about the need for individualized proof that class members received less than "actual cash value" for their totaled cars. *Id.*

at 31.  The majority decided that *Lara* should applies only to adjustments involving the "condition" of cars, and not to adjustments for "negotiation."  *Id.* at 23-24.  As Judge Rawlinson's dissent explains, that distinction "is singularly unpersuasive," *id.* at 32, and cannot be reconciled with *Lara*'s reasoning.

In *Lara*, the plaintiffs challenged a downward adjustment Liberty Mutual made to the value of dealer cars, which typically are in better condition than the average insured car on the road.  25 F.4th at 1136.  The plaintiffs sought class certification, arguing that they had "no need" to prove the fair market value of each class member's car "because[,] regardless of amount, the deductions were illegal" under Washington law.  Opening Br. 18, *Lara*, No. 21-35126 (Dkt. 8).  In other words, the plaintiffs contended that because Washington law "precludes the use of noncompliant deductions" of any kind, *id.*, policyholders necessarily were injured any time an illegal adjustment was made and could recover, as damages, "the exact amount of the improper deduction," *id.* at 18, 27.  That illegal-deduction theory was the basis of the plaintiffs' contention that common issues would predominate over individualized valuation issues.

12

In *Lara*, this Court rejected that approach, holding that it was not enough for the plaintiffs to focus on the allegedly unlawful nature of adjustments made during the valuation process. Instead, the plaintiffs also had to prove that any regulatory violation actually injured each class member by depriving them of "the actual cash value of his or her car"; after all, "if a putative class member was given that amount or more, then he or she cannot win on the merits," even if an unlawful adjustment was used along the way. 25 F.4th at 1139-40. And determining the "fair market value" of each class member's car, *id.* at 1136 (quoting Wash. Admin. Code § 284-30-320(1)), would demand "an involved inquiry for each person," requiring the court to "look[] into the actual pre-accident value of the car and then compar[e] that with what each person was offered." *Id.* at 1139. The plaintiffs thus could satisfy neither the predominance nor the superiority requirement of Rule 23. *Id.* at 1139-40.

*Lara* also rejected the plaintiffs' various attempts to avoid those individualized issues. It is not enough to prove a "violation of the regulation" alone, the Court explained, because private plaintiffs can sue over regulatory violations only when they show they were

13

actually harmed by the violations. 25 F.4th at 1139. Nor did it matter that the plaintiffs labeled the "adjustments 'illegal,'" because they still would have to prove a resulting injury. *Id.* at 1140.

This case is "virtually identical" to *Lara*, as Judge Rawlinson correctly noted in dissent. Op. at p. 31. Plaintiffs claim that the adjustments State Farm made are illegal under Washington law. They contend that they and other policyholders were necessarily injured any time the adjustments were applied, and that they are entitled to recover the exact amount of the "illegal" adjustments as damages. And they insist that this theory makes individualized fact-finding into the fair market value of each class member's vehicle unnecessary. *Lara* rejected all those contentions, and the district court was correct to decertify the classes.

The panel majority held that *Lara* applies solely to condition adjustments and not to negotiation adjustments. Op. 14-24. But as Judge Rawlinson details, the majority "cannot articulate a principled basis" for that distinction. Op. 36-37.

The majority emphasized that, according to Plaintiffs, while *some* condition adjustments can be legal in Washington, adjustments

14

for negotiation are always illegal because they "are not among" specified "price components insurers may consider" under Washington insurance regulations. Op. 7-8, 16-20. Because State Farm "could not lawfully make" negotiation adjustments under Plaintiffs' theory, class members "could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful" adjustment. *Id.* at 19-20.

But *Lara* addressed, and rejected, precisely that theory. The plaintiffs there also contended that the adjustments Liberty Mutual was making were flatly prohibited by Washington law, that application of an unlawful adjustment necessarily yielded injury, and that damages could be measured simply in the amount of the adjustment. *Supra* at 12. But as this Court explained, "calling Defendants' adjustments 'illegal'" provides no viable path around the individualized factfinding necessary to determine whether every class member received less or more than fair market value for her car. 25 F.4th at 1139-40. *Lara* thus "squarely forecloses" the majority's reasoning. Op. at 32-33 (Rawlinson, J., dissenting).

The majority also fixates on just one of the problems *Lara* identified—that some policyholders may have been paid based on appraisal rather than any valuation based on assertedly illegal adjustments. Op. 14-15. The majority says the district court here anticipated that particular problem by defining the class to include only those paid using a valuation report that included an "illegal" adjustment, and so must have resolved the entire suite of individualized issues *Lara* identified. *Id.* at 15-16. But as Judge Rawlinson notes, the majority's analysis "deletes the rest of the discussion" in *Lara*. *Id.* at 35. *Lara* identified a host of *other* individualized issues precluding certification—including that, "[e]ven for [any] plaintiff[s]" paid based in part on an "illegal" adjustment, "the district court would have to look into the actual value of the car, to see if there was an injury." 25 F.4th at 1139. The majority provides no basis for ignoring *Lara*'s reasoning as to those issues.

Ultimately, narrowing *Lara* to "condition" adjustments is no more principled than limiting it to cases involving plaintiffs named Lara. *Lara* is binding on all panels of this Court, and its precedential force covers all "'reasoning central to [its] decision.'" *Garcia v.*

16

*Holder*, 621 F.3d 906, 911 (9th Cir. 2010). A later panel facing the same issue as an earlier panel simply "'has no authority'" to discard the prior panel's reasoning. *United States v. Lucas*, 963 F.2d 243, 247 (9th Cir. 1992). The Court should grant rehearing to reinforce *Lara* and resolve the conflict the majority's decision creates.

## II. Rehearing Is Also Warranted Because the Majority's Opinion Creates a Circuit Split and Contravenes the Supreme Court's Decision in *TransUnion*.

As Judge Rawlinson observes, the majority's opinion not only conflicts with *Lara* but also "creates an unnecessary circuit split." Op. 28; *accord id.* at 37. The Fifth Circuit has recently decided two cases that follow *Lara* and are irreconcilable with the majority's decision here. Beyond that, the majority's approach conflicts with the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), as confirmed by a recent Third Circuit decision rejecting a similar illegal-deduction theory in another total-loss case.

In *Sampson v. USAA*, 83 F.4th 414 (5th Cir. 2023), the Fifth Circuit described *Lara* as "particularly instructive" and held that plaintiffs in total-loss class actions must offer a classwide method of proving that all policyholders received less than actual cash value.

17

*Id.* at 422-23. The court rejected the theory that one guidebook for measuring used-car values was "a determinant of injury and liability *as a matter of law*," just as this Court in *Lara* ("in an almost identical context") rejected the theory that the plaintiffs could prove liability just by showing that a valuation method was "unlawful." *Id.* In *Sampson* and *Lara*, the problem was the same: the plaintiffs had to prove actual underpayment based on the fair market value of each vehicle, but they offered no classwide way to do that.

In *Bourque v. State Farm Mutual Automobile Insurance Co.*, 89 F.4th 525 (5th Cir. 2023), the Fifth Circuit relied on *Sampson* to vacate certification of a class in a case that, just like this one, challenged State Farm's use of Autosource to estimate and pay policyholders the actual cash value of totaled cars. *Id.* at 528-29. The court reiterated that to prove a breach of contract, "proof of injury is required—proof that [the plaintiff] failed to establish can be made on a class-wide basis." *Id.* at 529.

The majority doesn't mention *Bourque* and disagrees with Judge Rawlinson about *Sampson*, dismissing it as "easily distinguishable." Op. 19 n.5. According to the majority, *Sampson* held

18

only that there were many "'legally permissible'" ways to prove the value of a totaled car, not just the plaintiffs' preferred way (one of multiple guidebooks). *Id.* And that, the majority continues, is distinct from a "putatively unlawful negotiation deduction." *Id.* at 20 n.5. That purported distinction misses the key point of *Sampson* and *Lara*: whether a valuation method is "unlawful" is irrelevant to the class-certification question, which hinges on whether the plaintiffs can "prove an actual underpayment by class-wide proof." *Sampson*, 83 F.4th at 422; *see Lara*, 25 F.4th at 1139-40.

Moreover, the majority never explains why, under the logic of *Sampson*, State Farm wouldn't have "the due process right to argue, for each individual plaintiff, that damages should be determined by a different legally permissible method that would produce lower damages . . . (or no damages at all)." 83 F.4th at 420. In other words, the majority disregards State Farm's due-process right to present its own evidence of what each car was actually worth. *Id.* That result is directly contrary to *Sampson*.

*Sampson* and *Bourque* are not the only appellate decisions that conflict with the majority's opinion. In *Lewis v. GEICO*, 98 F.4th 452

19

(3d Cir. 2024), the Third Circuit vacated certification of a total-loss class because the plaintiffs' theory of harm—that the insurer impermissibly applied a downward condition adjustment (the same adjustment that was at issue in *Lara*) in calculating actual cash value—was "too speculative to confer standing" under Article III. *Id.* at 461. Citing *Lara* and *TransUnion*, the Third Circuit emphasized that no plaintiff can maintain a lawsuit in federal courts simply by pointing to "'bare procedural violations.'" *Lewis*, 98 F.4th at 461. Because the only thing the plaintiffs in *Lewis* were prepared to prove was a "bare violation of New Jersey insurance rules," they lacked standing to sue. *Id.*

The same goes here. Plaintiffs don't intend to prove, for even a single policyholder, that State Farm paid too little for a totaled car. Instead, their theory is that State Farm took an unlawful deduction, and that every policyholder should be paid the exact amount of that deduction. The majority endorsed that theory, agreeing that "assessing the actual value of the car is unnecessary." Op. 27. As the majority sees it, "[h]ad the challenged negotiation adjustment not been applied, the valuation in the Autosource reports of Plaintiffs'

vehicles would have been higher and they would have been paid more by State Farm." *Id.* But State Farm never promised to pay policyholders "the valuation in the Autosource report minus any supposedly unlawful deductions"; it promised to pay them "actual cash value," which Washington law defines as "fair market value." Wash. Admin. Code § 284-30-320(1). If Plaintiffs don't intend to prove that they got anything less than that amount, then they won't satisfy Article III's requirement of proving actual injury.

In *TransUnion*, the Supreme Court made clear that a mere "injury in law," such as non-compliance with some "'regulatory law,'" isn't enough to open the doors of a federal courthouse. 594 U.S. at 427-28. No legislature can "freely authorize *unharmed* plaintiffs to sue defendants who violate [the] law." *Id.* at 429. The majority here holds the opposite—that the supposed illegality of a deduction under state law supplies a sufficient Article III injury, even if Plaintiffs have no method of proving that any policyholders received less than the fair market value of their cars. That ruling can't be reconciled with *TransUnion*, *Lewis*, or *Lara*.

No court of appeals, until the majority's decision, has endorsed certifying a class like the ones approved here. To the contrary, they have been consistently skeptical of class certification in this context. Not only have this Court, the Third Circuit, and the Fifth Circuit held that cases like this one were unsuitable for class treatment because individualized valuation issues would predominate, but several circuits also have recently granted interlocutory review of orders certifying total-loss classes. *Drummond v. Progressive Specialty Ins. Co.* (3d Cir. Nos. 23-8035, 24-1267); *Freeman v. Progressive Dir. Ins. Co.* (4th Cir. Nos. 24-177, 24-1684); *Clippinger v. State Farm Mut. Auto. Ins. Co.* (6th Cir. Nos. 23-508, 24-5421); *Schroeder v. Progressive Paloverde Ins. Co.* (7th Cir. Nos. 24-8003, 24-1559). Other circuits' unusual willingness to jump into the fray before final judgment reflects the weakness of decisions inconsistent with *Lara* and with other similar decisions.

It also reflects the exceptional importance of the issues presented here. Total-loss class actions like this one are significant cases, with plaintiffs seeking to recover large amounts on behalf of thousands of policyholders. Given the stakes and the number of

cases presenting similar issues, uniformity in the development of the law is essential.  Yet the majority's departure from *Lara* and from the decisions of other circuits will create uncertainty for insurers and policyholders alike on these frequently recurring questions.

## CONCLUSION

The Court should grant panel rehearing or rehearing en banc.

Dated:  October 3, 2024    Respectfully submitted,

/s/ Bradley J. Hamburger
Bradley J. Hamburger

*Counsel for Appellees State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*

# CERTIFICATE OF COMPLIANCE

This petition complies with the word limit of Circuit Rules 35-4(a) and 40-1(a) because it contains 4,193 words, excluding the portions exempted by Federal Rule 32(f).  It complies with the typeface and type-style requirements of Federal Rules 32(a)(5)(A) and (6) because it has been prepared in 14-point, New Century Schoolbook font.

Dated:  October 3, 2024          Respectfully submitted,

/s/ Bradley J. Hamburger
Bradley J. Hamburger

*Counsel for Appellees State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FAYSAL A. JAMA, on behalf of himself and all other similarly situated; JAMES KELLEY; ANYSA NGETHPHARAT, | No. 22-35449 |
| | D.C. Nos. 2:20-cv-00454-MJP |
| *Plaintiffs-Appellants*, | 2:20-cv-00652-MJP |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; STATE FARM FIRE AND CASUALTY COMPANY, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted June 13, 2023
Portland, Oregon

Filed August 19, 2024

2          JAMA v. STATE FARM MUT. AUTO. INS. CO.

Before: Johnnie B. Rawlinson and Jennifer Sung, Circuit
Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Rakoff;
Dissent by Judge Rawlinson

---

## SUMMARY[**]

---

### Washington Insurance Law

In a putative class action brought under Washington law
by drivers who alleged that their insurers failed to pay them
the actual cash value of their cars after their cars were totaled
in accidents, the panel (1) reversed the district court's order
decertifying the negotiation class, (2) affirmed the order
decertifying the condition class, (3) vacated the district
court's entry of summary judgment against each named
plaintiff, and (4) remanded for the district court to analyze
whether plaintiffs have introduced sufficient evidence of
injury.

Plaintiffs contended that their insurers applied two
putatively unlawful discounts in calculating their vehicles'
actual cash value: (1) a negotiation discount meant to
capture the typical amount buyers may negotiate down the
price of a replacement car, and (2) a condition discount
meant to capture the typical amount by which an insured's

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

car's actual condition might be worse than the condition of cars of comparable make and age on sale at dealers. The district court initially certified two classes: a negotiation class and a condition class. However, following this court's decision in *Lara v. First National Insurance Company of America*, 25 F.4th 1134 (9th Cir. 2022), the district court decertified each class and entered summary judgment against plaintiffs based on their putative failure to demonstrate injury.

The panel held that the district court abused its discretion in decertifying the negotiation class because plaintiffs established that injury could be calculated on a class-wide basis by adding back the putatively unlawful negotiation adjustment to determine the value each class member should have received.

The panel held that the district court did not abuse its discretion in decertifying the condition class because measuring each class member's injury required an individualized comparison of the putatively unlawful condition adjustment that their insurers actually applied and the hypothetical condition adjustment that their insurers could have lawfully applied.

The panel reversed the district court's summary judgment in favor of insurers as to the named plaintiffs' individual claims, and remanded for the district court to evaluate anew whether the named plaintiffs have adduced sufficient evidence of injury consistent with this opinion.

Finally, the panel rejected the insurers' alternative argument that Article III was a barrier to plaintiffs' suit.

Dissenting, Judge Rawlinson would hold that the majority opinion directly conflicts with *Lara*, and creates an unnecessary circuit split.

---

**COUNSEL**

Scott P. Nealey (argued), Law Office of Scott P. Nealey, San Francisco, California; Mark A. Trivett, Badgley Mullins Turner PLLC, Shoreline, Washington; Daniel R. Whitmore, Law Office of Daniel Whitmore, Tukwila, Washington; Stephen M. Hansen, Law Offices of Stephen M. Hansen PS, Tacoma, Washington; for Plaintiffs-Appellants.

Bradley J. Hamburger (argued), Daniel R. Adler, and Matt A. Getz, Gibson Dunn & Crutcher LLP, Los Angeles, California and Kristin A. Linsley, Gibson Dunn & Crutcher LLP, San Francisco, California; Peter W. Herzog III, Wheeler Trigg O'Donnell LLP, St. Louis, Missouri; Eric L. Robertson, Wheeler Trigg O'Donnell LLP, Denver, Colorado; Daniel N. Nightingale, Yetter Coleman LLP, Houston, Texas; for Defendants-Appellees.

## OPINION

Rakoff, District Judge,

Plaintiffs represent a class of drivers whose cars were "totaled" in accidents such that repair is impracticable and replacement necessary. Under Washington law, their insurers, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "State Farm")[1] must pay them the "actual cash value" of their cars. Plaintiffs contend that State Farm did not do so, because in calculating their vehicles' actual cash value, State Farm applied two putatively unlawful discounts: (1) a "negotiation" discount meant to capture the typical amount buyers may negotiate down the price of a replacement car, and (2) a "condition" discount meant to capture the typical amount by which an insured's car's actual condition might be worse than the condition of cars of comparable make and age on sale at dealers. Plaintiffs contend that Washington law entirely forbids the negotiation discount and does not allow State Farm to apply the condition discount in the manner it did.

The district court initially agreed with Plaintiffs as to their theories of liability and certified two classes of similarly situated insureds: a "negotiation" class and a "condition" class. Following our decision in *Lara v. First National Insurance Company of America*, 25 F.4th 1134 (9th Cir. 2022), however, the district court decertified each class and entered summary judgment against the named Plaintiffs

---

[1] Defendant State Farm Fire and Casualty Company is a wholly owned subsidiary of Defendant State Farm Mutual Automobile Insurance Company.

based on their putative failure to demonstrate injury. Because we conclude that the class based on the negotiation discount can prove injury on a class-wide basis, we reverse the district court's decision decertifying the negotiation class. However, because the condition class here is in all relevant aspects identical to the one in *Lara*, we affirm the district court's decision to decertify the condition class.

## I.  **BACKGROUND**

This appeal concerns putative class actions against State Farm based on how it compensates vehicle owners following crashes where the vehicles are "totaled"—meaning they are not reparable as a practical matter and need to be entirely replaced. Under the State of Washington's insurance regulations, an insurer owes an insured the "actual cash value" of a totaled car. Wash. Admin. Code § 284-30-391. "Actual cash value" is defined as "the fair market value of the loss vehicle immediately prior to the loss." *Id.* § 284-30-320(1). Washington's insurance regulations set forth various ways in which an insurer may go about ascertaining actual cash value, including by basing it on data for comparable vehicles in the local area, obtaining quotes from licensed dealers, analyzing data of advertised comparable vehicles, and so on. *Id.* § 284-30-391(2). While these regulations do not themselves create a direct cause of action, Plaintiffs contend they are incorporated into their insurance contracts and that a violation of the insurance regulations also constitutes a violation of the Washington Consumer Protection Act ("WCPA"), pursuant to which they are authorized to sue. *See Lara*, 25 F.4th at 1136.

As relevant here, after an insured's vehicle is totaled, the claims process ordinarily begins with an inspection of the car by a State Farm estimator. Following this inspection,

something called an "Autosource" report is prepared by a third-party vendor called Autodex. Such reports are used in over 99% of cases to prepare an initial valuation of the totaled car. The Autosource reports survey databases of the advertised price of comparable makes and models, and then make various "adjustments." The relevant adjustments include: (1) a "condition" adjustment, and (2) a "negotiation" adjustment. The condition adjustment assumes that the typical car in use is in worse condition and would sell for less than comparable cars advertised by dealers and reduces the advertised price by that difference. The negotiation adjustment assumes that the typical customer negotiates with the dealer and buys a car for less than the advertised price and is designed to capture that price difference.

Following preparation of the Autosource report, a State Farm claims handler reviews it to verify, among other things, the car's mileage, equipment, and condition. The handler then contacts the insured to discuss the preliminary valuation; if the insured can provide new information regarding the car's value, that may feed back into the valuation. If anything other than the Autosource report is used for valuation, that is documented and management approval is sought. If the parties cannot reach agreement as to the valuation, they instead pursue a process involving independent appraisers.

In both of the cases consolidated and under review here, Plaintiffs challenge the negotiation adjustment. They argue that Washington law specifies which price components insurers may consider when determining "actual cash value," and that negotiation discounts are not among them. State Farm moved to dismiss, but the district court agreed with Plaintiffs that Washington law does not allow insurers

to make negotiation adjustments and that Plaintiffs had therefore stated claims for both breach-of-contract and unfair trade practices under the WCPA.

In one of the cases, plaintiff Faysal A. Jama also challenges the condition adjustment. Unlike negotiation adjustments, Washington law expressly allows insurers to make "appropriate" condition adjustments. *See* Wash. Admin. Code § 284-30-391(4)(b), but Jama claims that State Farm's condition adjustments are inappropriate because they lack sufficient empirical foundation. The district court denied State Farm's motion to dismiss the condition adjustment claim, concluding that Jama's allegations that State Farm had "provided no basis on which to verify whether the perceived condition deduction was 'appropriate'" were sufficient to show a violation of Section 391(4)(b) and state a breach of contract claim.

The district court then certified two classes. For both cases, it certified a "negotiation class," consisting of: (1) Washington-based, State Farm insured car-owners whose vehicles were totaled, (2) "where [their] claims for total loss were evaluated by State Farm using the Autosource valuation system which took a deduction/adjustment for 'typical negotiation,'" (3) "where such claims were settled and paid using the amount determined in the Autosource valuation which took a deduction/adjustment for 'typical negotiation,'" and (4) "where such claims were paid . . . without the parties . . . using[] an alternative appraisal process." And, in *Jama*, the court certified a "condition" class consisting of: (1) Washington-based, State Farm insured car-owners whose vehicles were totaled, (2) where loss claims were evaluated "using the Autosource valuation system which took deductions for the condition of the loss vehicle," (3) where such claims were later paid using an

amount determined by Autosource that "took deductions for the condition of the loss vehicle," and (4) "where such claims were paid . . . without the parties . . . using[] an alternative appraisal process."

Although the Plaintiffs proposed broader classes that would have included anyone who simply received an Autosource report containing one or both of the disputed adjustments, the district court reasoned that such classes would include persons not actually injured by such adjustments. (This might happen if, for instance, the parties negotiated a different payment from that laid out in the Autosource report, or if they pursued the appraisal route.) It therefore narrowed the proposed classes to "include only those paid the value determined in an Autosource Report with the [relevant] discount applied." This ensured that the value of any unlawful adjustment could be determined on a class-wide basis.

Subsequently, this Court decided *Lara v. First National Insurance Company of America*, 25 F.4th 1134 (9th Cir. 2022) where we held that a district court faced with what was in some respects a similar putative class action—but which focused only on disputed "condition" adjustments—did not abuse its discretion in declining to certify a class. *Id.* at 1138–40. In *Lara*, the valuation process of insurer Liberty Mutual ("Liberty") involved, as here, obtain[ing] a "report about the value of 'comparable vehicles,'" following an inspection. *Id.* at 1136. Liberty worked with CCC Intelligent Solutions ("CCC") to develop these valuation reports. *Id.* And as in this case, that report "us[ed] a database of cars at dealerships all around the country," "start[ing] with the value of comparable cars—other cars that are a similar make and model, are in similar condition, and have similar features," before applying various adjustments. *Id.* Again, as

in this case, one such adjustment—applied uniformly across totaled cars—was a "condition adjustment" that reduced the estimated value of a totaled car relative to comparable cars sold at dealerships on the theory that comparable cars sold at dealerships "are usually in pretty good condition," and therefore likely worth more than an insured's totaled vehicle even if in most respects comparable. *Id.* at 1136–37. In *Lara*, "[p]laintiffs' theory of the case [wa]s that Liberty violate[d] Washington's insurance regulations by not itemizing or explaining this downward 'condition adjustment,' which makes it impossible to verify." *Id.* at 1137.

The *Lara* plaintiffs defined their proposed class to include any Washington-based driver whose car was totaled and who received at some point during Liberty's claims evaluation process a valuation report including the putatively unlawful (because it was un-itemized) condition adjustment. *Id.* at 1137, 1139. The proposed class included plaintiffs whose cars were valued using the CCC report with no further adjustments, plaintiffs for whom the CCC report provided a starting point for a higher negotiated offer, and plaintiffs who availed themselves of an alternative appraisal process. *Id*. Given this lack of uniformity, the district court declined to certify a proposed damages class "because it held both that individual questions predominated over common questions and that individualized trials were superior to a class action." *Id.* at 1136. On appeal, we concluded that "[n]either holding was an abuse of discretion" and affirmed. *Id.*

In *Lara* we recognized that "[w]hether Liberty and CCC's condition adjustment violates the Washington state regulations" was a question common to the class. *Id.* at 1138. But, answering that common question "require[d] an individualized determination for each plaintiff" because

Washington's insurance regulations did "not provide a private cause of action," such as would allow plaintiffs to prevail on any element of their claim merely by showing the illegality of Liberty's non-itemized conditions adjustment. *Id.* at 1138–40. Plaintiffs' actual causes of action for breach of contract and unfair business practices under the WCPA each included an element of injury. *Id.* at 1139. This meant each plaintiff had to show that they received less money than they were owed; in other words, that they received less than the vehicle's pre-crash "actual cash value," which in turn was defined as its "fair market value." *Id.* at 1136 (quoting Wash. Admin. Code § 284-30-320(1)).

First, we held that the class proposed in that case might easily include class members who were not actually injured by the un-itemized adjustments to vehicle value in CCC reports.[2] *Id.* at 1139. For example, we observed such a class might include: (1) persons for whom the condition adjustment was ultimately revised upward, (2) persons with whom Liberty negotiated a different amount, and (3) persons who challenged Liberty's valuation and ultimately received an appraisal to determine value. None of these persons would have been obviously injured by the inclusion of the disputed adjustment. *Id.* Second, we noted that even those individuals whose claims were paid based on CCC reports containing the disputed condition adjustments might not have been injured if the adjustment accurately approximated or overestimated the condition of their vehicles. *Id.* That

---

[2] As explained *supra* at 9, the district court in this case avoided this problem by narrowing the class to include only those who were paid the value assessed in the Autosource report, less the negotiation discount. Individuals who negotiated a higher payment than the Autosource valuation and individuals who used an alternative appraisal process were excluded from the modified class.

might happen, for instance, if an individual's car was in worse condition than comparable cars considered by CCC, such that Liberty, consistent with Washington law, could have applied an even greater adjustment if it had been appropriately itemized. Because such questions would need to be resolved individually, this Court held that the district court did not err in declining to certify a class. *Id.*

Following *Lara*, the district court in this case decertified both the negotiation and condition classes and granted summary judgment to State Farm on the individual Plaintiffs' claims. It reasoned that, under *Lara*, the mere fact of an illegal adjustment under Washington's insurance regulations did not suffice to establish injury. Because an insured might ultimately be paid their vehicle's actual cash value or more notwithstanding an unlawful adjustment, the district court found that the Plaintiffs could not prove injury on a class-wide basis by relying on class members' car value as calculated in the Autosource reports less the amount of the challenged negotiation or condition adjustments. And the Court went further, reasoning that "[t]he Ninth Circuit's decision in *Lara* makes clear that Plaintiffs have not provided sufficient evidence of injury to sustain their claims and that they lack standing," and that accordingly "*Lara* compels summary judgment in State Farm's favor."

This appeal followed.

## II. ANALYSIS

We have jurisdiction under 28 U.S.C. §§ 1291 and 1294. The district court's decision to decertify a class is reviewed for abuse of discretion. *Lara*, 25 F.4th at 1138. However, because courts lack "discretion to get the law wrong," any order granting or denying certification based on a legal error necessarily involves an abuse of discretion. *Id.* (citing

*Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001)). We review the district court's entry of summary judgment de novo. *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 973 (9th Cir. 2017).

Regarding the class decertifications, we conclude that the district court abused its discretion in decertifying the negotiation class. For this class, Plaintiffs established that injury could be calculated on a class-wide basis by adding back the putatively unlawful negotiation adjustment to determine the value each class member should have received. However, we affirm the district court's decertification of the condition class, since no one disputes that State Farm *could* have applied a lawful condition adjustment to each member of that class. Accordingly, it was not an abuse of discretion to conclude that measuring each class member's injury requires an individualized comparison of the putatively unlawful condition adjustment that State Farm actually applied and the hypothetical condition adjustment that State Farm could have lawfully applied.

We also reverse the district court's grant of summary judgment in State Farm's favor as to all of the named Plaintiffs' individual claims. We hold that nothing in *Lara* prevents Plaintiffs from relying on the Autosource reports as evidence of injury. We do not decide whether Plaintiffs have presented sufficient evidence of injury to survive summary judgment. Instead, we remand that question to the district court.

We discuss each conclusion below.

### A. The district court's decertification orders

#### 1. The Negotiation Class

The district court made an error of law by assuming *Lara* required decertification of the negotiation class despite (1) material differences between the negotiation class definition presented here and the condition class definition presented in *Lara*, and (2) material differences between the negotiation claim presented here and the condition claim presented in *Lara*.

In *Lara*, we held that common proof that an insurer unlawfully applied a standardized adjustment for the condition of a totaled vehicle in violation of Washington regulations would not suffice to establish class-wide injury. This was so for two reasons. *First*, the proposed class in *Lara* included any insured for whom such an adjustment was used in the insurer's initial valuation report, even if that adjustment was not ultimately reflected in the insurer's final payout. For instance, while the disputed condition adjustment in *Lara* involved a uniform *downward* adjustment to Liberty's estimate of value, that adjustment merely provided a starting place. Liberty and its contractee responsible for preparing the reports, CCC, "also look[ed] at the actual pre-accident condition of the totaled car," such that, "[i]f [the car] was in great condition, then CCC reverse[d] the negative adjustment and sometimes even applie[d] a positive adjustment." *Id.* at 1137. Because of this process, the proposed class of all drivers whose valuation process began with a report including the disputed condition adjustment would "include [] plaintiff[s] for whom Liberty used the CCC report with the disputed condition adjustment but ultimately gave a higher offer, either because of an upward adjustment or just as part of negotiations." *Id.* at

1139. Further, since insureds who challenged Liberty's valuation could opt instead into a process for having their car appraised, the proposed class would "also include [] plaintiff[s] who at first received the CCC report [with the challenged adjustment] but whose car was valued with an appraisal." *Id.* In other words, the class proposed in *Lara* would have included an unknown number of class members whose actual payout was untethered from the putatively unlawful adjustment, precluding common proof that all class members were injured by that adjustment.

Here, however, the district court, well before *Lara*, anticipated and solved this problem through its definition of the negotiation class. The district court rejected Plaintiffs' proposed class[3] precisely because such class would "include[] insureds who were not necessarily paid the amount determined in an Autosource Report with the typical negotiation discount applied" and who would therefore "not have injuries directly traceable to the negotiation discount and resolution of the legality of the deduction would not necessarily resolve their claims." But "[r]ather than deny class certification" on this basis, the district court "revise[d] the class definition to include only those [who were] paid the value determined in an Autosource report with the negotiation discount applied." On this basis, the district court declined to appoint one of the named plaintiffs, Ngethpharat, as a class representative because her payout was in fact not based on her initial Autosource report including the disputed adjustment. This narrowing of the proposed class sufficed by itself to prevent many of the situations we discussed at length

---

[3] Like the class proposed in *Lara*, Plaintiffs' proposed class would have included any insured whose initial valuation report included one of the disputed adjustments.

in *Lara* where class members might not have been injured by the putatively unlawful adjustment.

*Second*, *Lara* anticipated that even as to "a plaintiff whose car was valued using the CCC report with the disputed condition adjustment, and for whom Liberty used CCC's estimate without making any further adjustments . . . the district court would have to look into the actual value of the car, to see if there was an injury." *Id*. In *Lara*, class members for whom the disputed condition adjustment was too big (because their car's condition was better than CCC reported) were injured, but class members for whom the disputed condition adjustment was correct or too small (because their car's condition was as bad or worse than CCC reported) were not injured, and there was no way to determine whether a class member was injured on a class-wide basis.

Here, the district court took the *Lara* court's language regarding the condition adjustment and, assuming it applied equally to the negotiation adjustment, concluded that its narrowing of Plaintiffs' class definitions was insufficient to ensure that injury could be proved on a class-wide basis for the negotiation class. The district court reasoned that *Lara* required some additional individualized assessment of injury beyond the showing that an insured's payout was based on an unlawful adjustment. In so holding, the district court ignored the nature of the putatively unlawful condition adjustment at issue in *Lara* and how it differs critically from the negotiation adjustment at issue here: in essence, the parties agree that Washington law allows a condition adjustment; the parties dispute only whether State Farm calculates the condition adjustment lawfully. But Plaintiffs contend that Washington law flatly prohibits *any* negotiation adjustment; and if Plaintiffs are correct about that legal issue,

then each Plaintiff suffered damages equal to the amount of the negotiation adjustment that State Farm made. As explained further below, that difference between the condition and negotiation claims dictates a different outcome for the negotiation class.

As described above, Washington law requires insurers to pay the owners of totaled vehicles their vehicles' "actual cash value," defined as "the fair market value of the loss vehicle immediately prior to the loss." Wash. Admin. Code § 284-30-320(1). But Washington law does not leave it at that. It also tells insurers in some detail how to estimate vehicles' "actual cash" or "fair market value." For example, insurers may do so by: (1) obtaining quotes for a similar vehicle from multiple local licensed dealers, (2) averaging locally advertised prices of comparable vehicles, or (3) relying on "a computerized source to establish a statistically valid actual cash value" based on data sources meeting certain criteria. *Id.* § 284-30-391(2). Washington law further requires insurers to "[b]ase all offers on itemized and verifiable dollar amounts for vehicles that are currently available, or were available within ninety days of the date of loss, using appropriate deductions or additions for options, mileage or condition when determining comparability." *Id.* § 284-30-391(4)(b).

There is, therefore, no dispute that insurers may adjust an estimate based on comparable vehicles' value to take into account the totaled vehicle's pre-crash value. In fact, as just described, Washington's regulations affirmatively contemplate that insurers will do precisely this. *Id.* (allowing "appropriate deductions or additions," where "itemized and verifiable," based on, among other things, the loss vehicle's "*condition*" (emphasis added)). Plaintiffs' theory in *Lara* was that Liberty's standardized downward condition

adjustment "violate[d] Washington's insurance regulations [because it was] not itemiz[ed] or explain[ed] . . . which ma[de] it impossible to verify." 25 F.4th at 1137. No one in *Lara* disputed that Liberty *could* lawfully have applied a properly itemized and verifiable condition adjustment to calculate putative class members' actual cash value. Thus, there was no way to know whether any individual putative class member was injured by the standardized and un-itemized adjustment without individually inquiring into whether the adjustment *exceeded* whatever condition adjustment Liberty could lawfully have applied. Even for those class members "whose car[s] w[ere] valued using the CCC report with the disputed condition adjustment, and for whom Liberty used CCC's estimate without making any further adjustments . . . the district court would have [had] to look into the actual value of the car, to see if there was an injury." *Id.* at 1139.

Here, however, Plaintiffs have advanced an entirely different theory with respect to the *negotiation* class. As to that class, their theory is not that State Farm failed to follow the correct procedure for making permissible adjustments, but rather that Washington law does not permit State Farm to apply a discount for typical negotiation *at all*. *See* Wash. Admin. Code § 284-30-391(4)(b). The district court accepted this argument, holding that Washington law permits insurers to apply only those deductions explicitly laid out in Section 391(4)(b) and no others. State Farm has not challenged that holding here. Accordingly, Plaintiffs' challenge to the negotiation class here is materially distinguishable from the challenge in *Lara*: A class member in *Lara* might have been subject to the challenged condition deduction but been uninjured by it because a greater or equal condition addition could *also* have been lawfully applied.

This would lead a class member to receive the actual cash value of their vehicle or more. All members of the negotiation class[4] in this case, however, received less than they were owed in the exact amount of the impermissible negotiation deduction. As to the proposed negotiation class in this case, we therefore conclude that class members could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful negotiation discount. [5]

---

[4] As explained *ante* at 9, the district court narrowed the class here to include only those who were paid the value in the Autosource report with the unlawful negotiation deduction.

[5] The dissent incorrectly claims our decision today creates a circuit split. *See Dissenting Opinion*, at pp. 33-35. The Fifth Circuit decision that the dissent cites, *Sampson v. United Services Automobile Association*., 83 F.4th 414 (5th Cir. 2023), is easily distinguishable. That case involved a Louisiana statute that permitted actual cash value of a totaled vehicle to be calculated using "a generally recognized motor vehicle industry source." *Id.* at 417 (quotation omitted). Plaintiffs there argued that the method used by the defendant-insurer was unlawful because it was not a "generally recognized motor vehicle industry source" and proposed calculating damages by "arbitrarily choosing" another method that plaintiffs claimed was "generally recognized," called NADA. *Id.* at 417, 420. The problem with the class in that case was that there existed innumerable other "legally permissible method[s] of determining" actual cash value and those other methods could "produce lower damages than NADA (or no damages at all)," depending on the individual case. *Id.* at 420. This created an "an explosion of predominance issues" because there was just as strong of an argument that any of those other permissible methods should be used, and so, as to each class member, there would be a dispute over which alternative method to select and over whether that method showed each class member was injured at all. *Id.* Here, by contrast, the unlawful conduct challenged by the negotiation class is applying one specific deduction, not using a categorically unlawful method, and so there is no need to pick among alternative

In holding otherwise, the district court reasoned that Plaintiffs "ask[] the Court and fact finder to assume that one portion of an Autosource report got the [adjusted cash value] right, without any evidence as to why this is true." But what Plaintiffs in the negotiation class actually asked the factfinder to credit was the *whole* Autosource report[6], minus one specific uniformly applied downward adjustment that Plaintiffs contended and the district court agreed State Farm could not lawfully make.[7]

In resisting this conclusion, State Farm protests that measuring injury this way would allow Plaintiffs to rely solely on the fact of illegality to establish injury, a "shortcut" *Lara* supposedly rejected. And it is true that *Lara* held that merely "[c]alling Defendants' adjustments 'illegal'" does not suffice to prove injury. 25 F.4th at 1140. But State Farm ignores *why* that was. Class members in *Lara* might have received a report containing an unlawful adjustment while nonetheless receiving actual cash value. This would have been the case, for instance, where class members' payout

---

calculation methods. In the absence of defendants' allegedly unlawful conduct, each class member indisputably would have been paid the amount they actually received, plus the amount of the putatively unlawful negotiation deduction.

[6] State Farm itself used these reports to calculate adjusted cash value, and submitted extensive record evidence demonstrating why they constituted appropriate measures of cash value.

[7] While a declaration submitted by State Farm suggests that *condition* adjustments in the initial Autosource report are often subsequently refined for individual insureds based both on the State Farm claim handler's investigation of the condition of the totaled vehicle and negotiation with the insured, there is no comparable suggestion that any *negotiation* adjustment that is applied is subject to further individualized adjustment.

was based on an alternative appraisal. *Id.* at 1139. This also would have been the case where payout was based on a valuation report, but the condition adjustment accurately reflected the actual condition of the car—notwithstanding the fact that it was un-itemized. *Id.* None of these factors is relevant to the negotiated adjustment as applied to the class here, where members of the narrowed class were simply paid what the Autosource report determined, including the putatively unlawful negotiation discount. While an un-itemized condition adjustment could nevertheless have accurately reflected the condition of the car for some class members in *Lara*, there is no negotiation adjustment that could accurately price the negotiation discount here if Plaintiffs are correct that the adjustment is *always* unlawful, regardless of the amount.

State Farm also avers that, in *Lara*, plaintiffs argued "that the only possible definition of 'actual cash value' in the regulations is the value given by the prescribed process, and thus that the injury for each plaintiff is the amount of the condition adjustment." *Id.* at 1140. And since *Lara* rejected this argument, State Farm contends that determining "actual cash value" in litigation requires some assessment *independent from* Washington's regulatorily prescribed process.

But, once again, State Farm ignores why *Lara* found plaintiffs' argument unconvincing. As we explained in *Lara*,

> [i]f the condition adjustment was applied for a plaintiff but then that plaintiff still got an amount equal to what he or she would have gotten if the adjustment was not applied (or more than that), then there was no breach of contract [or WCPA claim] because there was

> no injury . . . [which] could easily have
> happened [if] CCC or Liberty . . . adjusted the
> value back up, Liberty . . . made a higher
> offer, or the parties [did] appraisals.

*Id.* In other words, *Lara* rejected measuring injury based on
a failure to "follow the prescribed process" because a
procedural violation does not necessarily lead to an incorrect
result; if the improper process happened to produce a correct
result (or a result that favored plaintiffs), then plaintiffs were
not actually paid less than they were owed. The *Lara* class,
unlike the narrowed negotiation class in this case, included
members who may not have been injured by the allegedly
unlawful process. Here, by contrast, the narrowing of the
class leaves only those class members who (1) were paid
based on the Autosource report, excluding those who
negotiated or pursued an appraisal, and (2) were paid a
negotiation adjustment that, according to the Plaintiffs, can
never measure a lawful deduction. By narrowing the class,
the district court thus avoided the injury irregularity problem
we identified in *Lara*.

   *Lara* did not hold, as State Farm claims, that Washington
law either does not or cannot define the substantive inputs
that constitute actual cash value. And here, Plaintiffs'
argument is that State Farm accurately estimated the actual
cash value of their vehicles based on several permissible
inputs and then applied one further subtraction that
Washington law entirely forbids. Nothing in *Lara* precludes
common proof of injury as the amount of State Farm's
estimates less the impermissible deduction as to the class of

owners who were paid the Autosource valuation.[8] Accordingly, we conclude the district court abused its discretion in decertifying the negotiation class.

### 2. The Condition Class

Our analysis above does not hold true for the condition class. As discussed above, the district court's narrowed class definition avoided many of the problems of common proof discussed in *Lara*. Specifically, the condition class certified here excluded those Plaintiffs whose ultimate payout was not directly based on a valuation report containing the challenged deduction. *See Lara*, 25 F.4th at 1139–40. But the narrowed class definition alone does not exclude the "plaintiff whose car was valued using the [Autosource] report with the disputed condition adjustment, and for whom [State Farm] used [Autodex's] estimate without making any further adjustments," whose payout nonetheless equaled or exceeded their pre-crash car's actual cash value because the adjustment accurately reflected the condition of the car. *Id.* at 1139.

Plaintiffs in *Jama* raise various distinctions between the condition class presented here and that in *Lara*. They argue, for instance, that the plaintiffs in *Lara* merely challenged Liberty's refusal to itemize, whereas here the *Jama* Plaintiffs challenge the substance of State Farm's condition adjustment because they were not made "when determining comparability." Wash. Admin. Code § 284-30-391(4)(b). We note that the district court characterized the condition class here as materially identical to that in *Lara*: as based on State Farm's failure "to verify whether the perceived

---

[8] We address (and reject) State Farm's argument that measuring injury this way violates Article III below. *See* II.B.2, *infra*.

condition deduction was 'appropriate.'" In any event, as
Plaintiffs' counsel confirmed at oral argument, the condition
class in *Jama* does not differ from that in *Lara* in the way
most relevant. As to the condition class, Plaintiffs do not
dispute that *some* condition adjustment could lawfully have
been taken. Accordingly, just as in *Lara*, there is no way to
know as to any individual class member in the condition
class whether their actual payout was more, less, or equal to
what State Farm *could* lawfully have paid if it had calculated
a condition adjustment appropriately. *Lara*, 25 F.4th at 1139.
There is therefore no way to know without individualized
inquiry whether such a class member received less than their
car's actual cash value and therefore suffered any injury. For
this reason, the district court did not abuse its discretion in
decertifying the condition class.

## B.  The district court's entry of summary judgment

### 1.  Proof of injury under Washington law

Because we conclude that the district court misread *Lara*
as to the negotiation discount, it follows that the district
court's entry of summary judgment against the named
Plaintiffs based on their claims for the negotiation discount
was in error. We further hold that—even as to the challenged
condition adjustment—the district court also erred in
holding that Plaintiffs could not rely on the Autosource
reports, and the amount of a challenged adjustment, as
relevant evidence of value and injury.

The district court based its entry of summary judgment
largely on its reading of *Lara*. But *Lara* did not purport to
address the actual evidence any individual Plaintiff must
adduce to give rise to a genuine dispute of material fact. The
question at issue in *Lara* was whether the district court
abused its discretion in declining to certify a class where

common issues did not predominate over individual ones, therefore requiring an individualized injury inquiry. *Lara*, 25 F.4th at 1138–40.[9]

To be sure, in analyzing whether individualized issues relating to injury predominated over common ones, *Lara* necessarily discussed how plaintiffs alleging breach of contract or violations of the WCPA could go about demonstrating injury. As to that question, *Lara* held that merely adding back to the insurer's valuation report the full amount of a putatively unlawful applied condition adjustment might, in many cases, not embody the proper measure of a class member's injury. 25 F.4th at 1139. This would be the case, for example, where payouts were not actually based on the challenged adjustment, or where, even if payouts were based on the challenged adjustment, they still exceeded actual cash value. *Id.*

But the fact that an insurer's own valuation of an insured's pre-crash vehicle minus one putatively unlawful adjustment may not correctly measure injury for all plaintiffs does not mean that it cannot provide a starting place. In fact, in language entirely ignored by the district court, *Lara* explicitly agreed that "the amount of the [putatively unlawful] deduction would still be . . . [s]ome relevant evidence" of injury. 25 F.4th at 1140. Nothing in *Lara* required (as the district court appeared to believe)

---

[9] Indeed, the same district court whose order denying class certification we affirmed in *Lara* issued just three weeks before that order an order *denying* the motion of one of the defendants for summary judgment. There, that district court rejected that defendant's argument that plaintiffs who received payment after their cars were initially valued by reports with a challenged condition adjustment could not demonstrate injury based on that adjustment. Order at 10–13, *Lundquist v. First Nat'l Ins. Co.*, No. 18-cv-5301 (W.D. Wash. Oct. 1, 2020), ECF No. 14.

"[p]laintiffs [to] undertake[] a[] separate valuation process or retain[] an expert to opine on the value of the loss vehicles." Indeed, State Farm itself used the Autosource reports as one proper measure of actual cash value. And ample evidence provided by State Farm itself demonstrated how the Autosource reports were prepared and why they provided an accurate measure of the pre-crash actual cash value of drivers' cars. We see no reason why a plaintiff seeking to prove injury cannot rely on the Autosource reports themselves to establish value, minus the unlawful negotiation adjustment. And here, as noted, the class is limited to those who were paid the Autosource valuation. Accordingly, the district court's conclusion that *Lara* requires individual plaintiffs to introduce evidence of value independent of the valuation reports was error. We therefore vacate its entry of summary judgment in favor of State Farm. On remand, the district court should evaluate anew whether the named Plaintiffs have adduced sufficient evidence of injury consistent with this opinion.**[10]**

---

[10] As to specific named plaintiffs, it may be clear from the records that the Autosource reports less a challenged adjustment do not provide sufficient evidence of injury to get past summary judgment. For instance, named plaintiff Ngethpharat's payout was not directly based on an Autosource report containing a challenged deduction since she challenged State Farm's initial valuation and subsequently obtained a second valuation excluding the challenged deduction, which is why the district court excluded her from the class it certified. We do not today decide whether Ngethpharat or any other named plaintiff in fact adduced sufficient evidence of injury to survive summary judgment. Rather, we merely hold that nothing about *Lara* precludes plaintiffs from relying on the difference between an insurer's calculation of value and the amount of a challenged adjustment as relevant evidence of injury. The district court should apply this standard to the claims before it in the first instance.

## 2. Standing

With a drumbeat of citations to *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), State Farm argues in the alternative that Article III precludes relying on an unlawfully applied adjustment as evidence of injury, because allowing Plaintiffs to recover the amount of an unlawful adjustment would somehow result in their recovering for an "injury in law" without any actual reference to the lost value of the car. But assessing the actual value of the car is unnecessary to determine there is standing here. Plaintiffs' claim is that they were paid less than they were owed under their insurance policies with State Farm. Had the challenged negotiation adjustment not been applied, the valuation in the Autosource reports of Plaintiffs' vehicles would have been higher and they would have been paid more by State Farm. That is "a classic pocketbook injury sufficient to give [a plaintiff] standing." *Tyler v. Hennepin Cty.*, 598 U.S. 631, 636 (2023) (holding that plaintiff had Article III standing where defendant "illegally appropriated" a "surplus" of a debt plaintiff owed to defendant).

*TransUnion* is inapposite. There, the purported "injury" that the Supreme Court held did not confer standing was "the mere existence of inaccurate information in a database." *TransUnion*, 594 U.S. at 434. By contrast, the injury here—a lighter wallet—has long been "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 432. Article III is thus no barrier to Plaintiffs' suit.

## III. <u>CONCLUSION</u>

For the foregoing reasons, we reverse the district court's order decertifying the narrowed negotiation class, but affirm

its order decertifying the condition class.[11] We also vacate the district court's entry of summary judgment against each named Plaintiff and remand for the district court to analyze whether Plaintiffs have introduced sufficient evidence of injury consistent with this opinion.

Each party shall bear their own costs.

REVERSED IN PART AND REMANDED.

**Rawlinson, Circuit Judge, dissenting:**

I respectfully dissent from the majority opinion because, in my view, it directly conflicts with our recent precedent as set forth in *Lara v. First National Insurance Co.*, 25 F.4th 1134 (9th Cir. 2022), and creates an unnecessary circuit split.

In *Lara*, a case with facts similar to those presented in this appeal, we concluded that the district court did not abuse its discretion when it denied class certification. *See id.* at 1136. The plaintiffs sought certification of a damages class comprised of individuals whose automobiles were totaled in a motor vehicle accident. *See id.* In assessing the "actual cash value" of the totaled vehicle, the insurance company relied upon a report that set forth the "value of comparable

---

[11] We deny plaintiffs' motion to certify to the Washington Supreme Court the question of whether the district court's application of *Lara* to require individualized proof of injury outside the Autosource reports is contrary to Washington law. We read *Lara* as relating to how plaintiffs may demonstrate the predominance of common inquiries under Rule 23, and not, as the district court held, as imposing substantive new barriers on plaintiffs seeking to prove injury under Washington law. Therefore, we do not believe this case involves any substantial unresolved question of state law. *See Murray v. BEJ Mins., LLC*, 924 F.3d 1070, 1072 (9th Cir. 2019).

vehicles." *Id.* (internal quotation marks omitted). From that report, the insurance company adjusted the valuation based on "a condition adjustment," derived from the difference between the condition of the vehicle being valued and the condition of "[u]sed cars for sale at dealerships." *Id.* at 1136-37.

After the insurance company valued the plaintiffs' vehicles using the "downward condition adjustment," they sued their insurer and the company that prepared the valuation report. *Id.* at 1137 (internal quotation marks omitted). Plaintiffs asserted that the insurer violated the state's "insurance regulations by not itemizing or explaining [the] downward condition adjustment." *Id.* (citation and internal quotation marks omitted).[1]

Following the district court's denial of class certification, the plaintiffs filed an appeal with this court. We concluded that a common question existed as to whether the conditions adjustment violated the state regulations. *See id.* at 1138. However, we added that "to show liability for breach of contract or unfair trade practices, Plaintiffs must also show an injury. And to show an injury will require an individualized determination for each plaintiff." *Id.*

---

[1] The applicable regulation required insurers "to itemize the deductions or additions that they make, and that these adjustments be appropriate." *Id.* (citing Wash. Admin. Code § 284-30-320(3)). "Because these regulations are enforced by the Washington insurance commissioner, and do not create a private cause of action, Plaintiffs couldn't sue [the insurer and the company that prepared the report] directly for violating [the regulations], so they sued [the insurer] for breach of contract and both companies for unfair trade practices and civil conspiracy." *Id.* (citations omitted).

30          JAMA v. STATE FARM MUT. AUTO. INS. CO.

We explained that the insurer "only owed each punitive class member the actual cash value of his or her car." *Id.* at 1139. If a class member received the actual cash value or more, that class member has not been injured. *See id.* Consequently,

> figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person. More particularly, it would involve looking into the actual pre-accident value of the car and then comparing that with what each person was offered, to see if the offer was less than the actual value. Because this would be an involved inquiry for each person, common questions do not predominate.

*Id.*

We clarified that even for a plaintiff whose car was valued using the disputed report, the court would still "have to look into the actual value of the car, to see if there was an injury." *Id.*

We further clarified that "[a] violation of the regulation isn't a breach. Breach of contract requires not just a violation of the terms of the contract but also an injury." *Id.* (citation and footnote reference omitted). The same was true for Plaintiffs' unfair trade practices claim. *See id.*

We rejected the plaintiffs' argument that their injuries could be established simply by referring to "the amount of

the condition adjustment" for each plaintiff. *Id.* at 1140. We responded:

> But that's still not right. If the condition adjustment was applied for a plaintiff but then that plaintiff still got an amount equal to what he or she would have gotten if the adjustment was not applied (or more than that), then there was no breach of contract because there was no injury.

*Id.*

We observed that the situation of a plaintiff receiving equal to or in excess of "what he or she would have gotten if the adjustment was not applied" "could easily have happened." *Id.* By way of example, we noted that the company preparing the report or the insurer "could have adjusted the value back up, [the insurer] could have made a higher offer, or the parties could have done appraisals." *Id.* We agreed that the insurer was "correct to say that on this point, Plaintiffs essentially ask for a strict liability remedy which is not provided by their causes of action." *Id.* We concluded that "because figuring out whether each plaintiff was injured would be an individualized process, the district court did not abuse its discretion in finding that individual questions predominated." *Id.* Stated differently, the existence of the condition adjustment is not the end of the story or the analysis.

The facts in the case before us are virtually identical to those in *Lara*. The only difference is that in addition to a condition adjustment, the insurer in this case also applied a negotiation discount reflecting the average amount a buyer could negotiate from the price of a replacement vehicle.

My colleagues in the majority followed the *Lara* decision and do not challenge the denial of certification for the condition adjustment claims. *See Majority Opinion*, pp. 23-24. However, their attempt to distinguish *Lara* as applied to the negotiation adjustment claims, in my view, is singularly unpersuasive.

The majority offers the following reasoning for excepting the negotiation condition from the *Lara* analysis. First, the majority reasons that "Plaintiffs contend that Washington law flatly prohibits *any* negotiation adjustment; and if Plaintiffs are correct about that legal issue, then each Plaintiff suffered damages equal to the amount of the negotiation adjustment that [the insurer] made." *Majority Opinion*, pp. 16-17 (emphasis in the original). However, *Lara* squarely forecloses this reasoning. *See* 25 F.4th at 1139 ("A violation of the regulation isn't a breach of the contract between the insurer and the insured.") (footnote reference omitted). In any event, "even if a violation of the regulations [were] a breach of the contract, Plaintiffs still have to show harm." *Id.* at 1139 n.4. And Plaintiffs may not use the report to establish harm. *See id.* at 1140 (describing this argument as "essentially ask[ing] for a strict liability remedy which is not provided by their causes of action."); *see also id.* ("Plaintiffs finally resort to calling Defendants' adjustments 'illegal.' But that's an argument for the Washington insurance commissioner, the official who could prosecute this kind of alleged violation. . . .").

Next, the majority reasons that proposed negotiation class members "could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the . . . reports the amount of the unlawful negotiation discount." *Majority Opinion*, p. 19. However, this approach is also specifically foreclosed by the analysis

in *Lara*.  *See* 25 F.4th at 1139 ("[F]iguring out whether each individual putative class member was harmed would involve an inquiry specific to that person.  More particularly, it would likely involve looking into the *actual* pre-accident value of the car and then comparing that with what each person was offered . . .") (emphasis added).  The quoted language nullifies the majority's implied argument that the actual value is the value of the vehicles "as calculated in the . . . reports" plus "the amount of the unlawful negotiation discount." *Majority Opinion*, p. 19.  But, as we observed in *Lara*, "that's still not right." 25 F.4th at 1140.  "While the condition adjustment here is applied across the board, other compensating adjustments and the ultimate valuation are made individually.  And it's those other things that would require more individualized inquires here." *Id.*; *see also id.* at 1136 (discussing the baseline evaluation for each car based on "comparable vehicles").

The majority's approach is not only contrary to our precedent, but it would also create a circuit split, a circumstance we strive to avoid. *See Global Linguist Solutions, LLC v. Abdelmeged*, 913 F.3d 921, 923 (9th Cir. 2019).  In *Sampson v. United Servs. Auto. Ass'n.*, 83 F.4th 414, 422 (5th Cir. 2023), the Fifth Circuit found our decision in *Lara* "particularly instructive" to its analysis in a case that, as in *Lara*, involved a valuation report utilized by the insurer to calculate the actual cash value (ACV) of a totaled car. *See id.* at 417.

Under Louisiana statutes, the actual cash value of the vehicle "shall be derived by using a method that falls into one of three broadly defined categories, one of which is use of a generally recognized motor vehicle industry source." *Id.* (citation and internal quotation marks omitted).  As in *Lara*, the plaintiffs in *Sampson* argued that the valuation

method used by the insurer was "not a legal method" under the statute, including because the method "negatively adjust[ed] vehicles' ACV based on such things as damage to the vehicle." *Id.*

In rejecting this argument, the Fifth Circuit drew a distinction between the selection of a damages model and the determination of liability for injuries incurred. *See id.* at 421-22. The Fifth Circuit reasoned that in the class certification context, "although ample authority suggests" that district courts

> have great discretion in choosing among damages models, especially estimative damages models at the certification stage, those authorities do not say that courts have similar discretion in choosing among models of injury and liability. *See e.g.*, *Terrebonne Fuel & Lube, Inc. v. Placid Refin. Co.*, 681 So.2d 1292, 1300 (La. App. 4 Cir. 1996) (There must be "proof that there has been some damages" *i.e.*, "that damage has actually occurred, before there is discretion to assess the *amount* of damages").

*Id.* at 422 (emphasis in the original).

The Fifth Circuit emphasized the accepted premise "that common questions may predominate under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages. But while damages are specifically described among these other important matters, liability and injury are not." *Id.* (citations and internal quotation marks omitted).

JAMA V. STATE FARM MUT. AUTO. INS. CO.                35

The Fifth Circuit concluded that "a district court's wide discretion to choose an imperfect estimative-damages model at the certification stage does not carry over from the context of damages to the context of liability." *Id.* at 422-23, *see also Bourque v. State Farm Mutual Auto Ins. Co.*, 89 F.4th 525, 528-29 (5th Cir. 2023) (following the analysis articulated in *Sampson*).

The Fifth Circuit's rulings are consistent with our analysis in *Lara*. The majority opinion is not. Like the plaintiffs in *Sampson*, the majority opinion conflates a damages model with the required demonstration of injury. *See Lara*, 25 F.4th at 1140 (noting the existence of adjustments other than the condition adjustment that were "made individually").

The same is true for the negotiation adjustment. Under the facts of this case, we know that in addition to the negotiation adjustment, a condition adjustment was also applied on an individualized basis. *See Majority Opinion*, pp. 23-24. The Majority Opinion acknowledges that "the district court did not abuse its discretion in decertifying the condition class." *Majority Opinion*, p. 24. However, the Majority Opinion nevertheless seeks to rationalize reliance on the condition adjustment and the negotiation adjustment to establish injury. *See Majority Opinion*, p. 25 ("*Lara* explicitly agreed that the amount of the putatively unlawful deduction would still be some relevant evidence of injury. . . .") (citation, alterations, and internal quotation marks omitted). But the Majority Opinion deletes the rest of the discussion. Immediately following the language quoted by the majority, the *Lara* decision explained that even if the amount of the deduction would be "relevant evidence," that fact is "beside the point" because "[s]ome relevant evidence could be in common, but much of it wouldn't be, and that's

why the district court didn't abuse its discretion in finding that individual questions predominate." 25 F.4th at 1140. *See also Sampson*, 83 F.4th at 422 (interpreting *Lara* as "finding that predominance was not satisfied where plaintiff class members could show that an insurer's use of [a valuation report] was unlawful but could not prove an actual underpayment by class-wide proof"). Indeed, *Lara* characterized this very argument as "essentially ask[ing] for a strict liability remedy." 25 F.4th at 1140.

The same analysis forecloses the majority's contention that "a plaintiff seeking to prove injury [can] rely on the [valuation] reports themselves to establish value, minus the unlawful negotiation adjustment." *Majority Opinion*, p. 26. But there are two problems with this argument. The first problem is that equating value with a demonstration of injury impermissibly conflates the injury issue with the damages issue. *See Sampson*, 83 F.4th at 422-23; *see also Lara*, 25 F.4th at 1140 (describing this argument as "essentially ask[ing] for a strict liability remedy"). The second problem is that the "unlawful" nature of the adjustment cannot establish an injury. *See Lara*, 25 F.4th at 1140.

The majority concedes that *"Lara* held that merely calling Defendants' adjustments illegal does not suffice to prove injury." *Majority Opinion*, p. 20 (citation and internal quotation marks omitted). The majority seeks to avoid this ruling by giving its explanation of "*why*" the *Lara* court reached the conclusion that alleged illegality is insufficient to establish an injury. *Id.* (emphasis in the original). But no "explanation" can change the unqualified language used by the *Lara* court. Regardless of why the ruling was made, it is clear: the alleged illegality of the condition does *not* establish injury. *See Lara*, 25 F.4th at 1140. At bottom, the majority cannot articulate a principled basis upon which to

distinguish this case from our holding in *Lara*.  In addition, the majority opinion creates an unwarranted circuit split.  For these reasons, I respectfully dissent.